LaSALLE BANK NATIONAL ASSOCI-
ATION, in its capacity as Trustee for
Nomura Depositor Trust ST I Com-
mercial Pass–Through Certificates
series 1998–ST I, Plaintiff,

v.

MIDDLEBELT PLYMOUTH VEN-
TURE, L.L.C., a Michigan limited lia-
bility company and Wonderland
Shopping Center Venture Limited
Partnership, a Michigan limited part-
nership, Defendants.

No. 01–CV–74695–DT.

United States District Court,
E.D. Michigan,
Southern Division.

Aug. 30, 2002.

Robert P. Hurlbert, Dickinson Wright, Bloomfield Hills, MI, Eric S. Rosenthal, Barris, Sott, Kathleen A. Lang, Dickinson Wright, Detroit, MI, for plaintiff.

I.W. Winsten, Brian D. Wassom, Honigman, Miller, Detroit, MI, for defendants.

## MEMORANDUM OPINION AND ORDER

HOOD, District Judge.

Before the Court is Defendants Middlebelt Plymouth Venture, L.L.C. ("Plymouth") and Wonderland Shopping Center Venture Limited Partnership's ("Wonderland") (collectively "Defendants") Motion to Dismiss and/or for Summary Judgment, filed January 30, 2002. Plaintiff LaSalle Bank National Association's ("LaSalle") filed a Response on March 1, 2002, and Defendants filed a Reply brief on March 15, 2002. A hearing was held on this matter on April 8, 2002. For the following reasons, Defendants' Motion to Dismiss and/or for Summary Judgment is **GRANTED**.

## I. FACTS

Plaintiff LaSalle Bank National Association brings this diversity action in its capacity as Trustee (hereinafter "LaSalle") for the benefit of CDC Depositor Trust ST I Commercial Pass–Through Certificates Series 1998–ST I (hereinafter "Trust"). LaSalle maintains its principal place of business in Chicago, Illinois, and is a citizen of the State of Illinois. Compl. at ¶ 1.

The Complaint was filed on December 11, 2001.

Defendant Wonderland Shopping Center Venture Limited Partnership ("Wonderland") is a Michigan limited partnership having its principal place of business in Southfield, Michigan. LaSalle asserts, on information and belief, that Wonderland is a resident of the State of Michigan, and Wonderland's partners are residents of the States of Michigan or Florida. Wonderland operated a shopping center in Livonia, Michigan, commonly known as Wonderland Mall. *Id.* at ¶ 2. LaSalle made a loan in the amount of approximately $41,000,000 to Wonderland secured by a mortgage on the Wonderland Mall and all items or property appurtenant therto. *Id.* at ¶ 4.

Defendant Middlebelt Plymouth Venture L.L.C. ("Middlebelt") is a Michigan limited liability company having its principal place of business in Southfield, Michigan. LaSalle alleges, also on information and belief, that Middlebelt is a citizen of Michigan and is the "alter ego" of Wonderland. LaSalle claims that Middlebelt was formed by the principals of Wonderland for the purpose of avoiding Wonderland's obligations to its Lender, LaSalle under a Loan Agreement and Mortgage. *Id.* at ¶ 6.

LaSalle alleges that on December 11, 1997, Defendant Wonderland Shopping Center Venture Limited Partnership ("Wonderland Shopping Center") entered into a loan transaction with LaSalle's predecessor in interest, Nomura Asset Capital Corporation (hereinafter "NACC") pursuant to which Wonderland Shopping Center borrowed from NACC the sum of $41,650,000 (hereinafter "Loan") for its shopping center pursuant to the terms of a written agreement ("Loan Agreement") and related loan documentation (collectively "Loan Documents") including the Mortgage dated December 11, 1997 ("Mort-

gage"). *See* Compl. at ¶ 7. The NACC assigned the Loan to its affiliate Nomura Depositor Trust ST I ("Trust"), retaining certain rights to direct its affiliate with respect to such Loan. *Id.* at ¶ 8.

Nomura Depositor Trust ST I established the Trust with LaSalle acting in the capacity as Trustee and assigned the Loan to the Trust. *Id.* at ¶ 9. Subsequently, NACC's rights regarding the Loan, as well as NACC's interest in its affiliate Trust, were sold to CDC Mortgage Capital, Inc. ("CDC") on August 2, 1999. *Id.* at ¶ 10. LaSalle continued to act as Trustee for the Trust, which continued to be the holder of the Loan. The Loan Agreement and Loan Document are currently in the possession of LaSalle and the Wonderland Defendants. *Id.*

As defined in the Mortgage, the property securing the repayment of the Loan consists of the Premises and the Improvements [the buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and other improvements now or hereafter located thereon], together with:

> [A]ll right, title, interest and estate of [Wonderland] now owned, or *hereafter acquired*, in "all estates, rights, titles, interests, privileges, liberties, tenements hereditaments and appurtenances of any nature whatsoever, in any way belonging, relating or pertaining to the Premises and the Improvements."

*Id.* at ¶ 11. All such property securing repayment of the loan was to be referred to as "Property." *Id.* Section 8(a) of the Mortgage prohibited Wonderland from selling, conveying, alienating, mortgaging, encumbering, pledging, or otherwise transferring the Property or permitting the sale, conveyance, alienation, mortgage, encumbrance, pledge, or any part thereof, without LaSalle's prior written consent. *Id.* at ¶ 12.

According to LaSalle, Wonderland unilaterally reduced its loan payment due on January 11, 2001, constituting a breach under the Loan Agreement. *Id.* at ¶ 13. However, On January 4, 2001, Wonderland filed Civil Action No. 01–70056 in this Court ("Wonderland I") in which Wonderland sought a declaration from this Court under the Loan Agreement the lender was required to reduce or "resize" the Loan on its third anniversary date and that Wonderland would not be considered to have defaulted by unilaterally reducing its January 11, 2001 payment. *Id.* at 29. LaSalle was not an original defendant to this action. *Id.*

LaSalle notified Wonderland on or about January 18, 2001, that Wonderland was in monetary default and provided Wonderland ten (10) days to cure the default. *Id.* at ¶ 14. On or about March 13, 2001, after Wonderland failed to cure the default, LaSalle notified Wonderland of its election to accelerate the indebtedness secured by the Mortgage and to commence foreclosure by advertisement. *Id.* at ¶ 15. LaSalle was added as a defendant to Wonderland Suit I by Wonderland's Amended Complaint filed March 21, 2001. *Id.* at ¶ 29. Wonderland thereafter sought to enjoin LaSalle from concluding a statutory foreclosure by advertisement of the Mortgage of Wonderland's Shopping Center. *Id.* This Court decided Wonderland I on cross-motions for summary judgment filing its Opinion and Order on May 4, 2001, and entering Judgment in favor of Defendants' favor on May 11, 2001. *Id.* LaSalle foreclosed on the Mortgage and successfully bid at the resulting Sheriff's sale held on May 18, 2001. Wonderland's statutory right of redemption in the Property expired unexercised on November 18, 2001, and LaSalle is now the fee owner of the Property.

Of particular importance to this suit is property located adjacent to the Wonderland Mall once owned by the Montgomery Ward Store (the "Ward Property"). *Id.* at ¶ 3. The Ward Property, according to the Complaint, "has heretofore been operated as an integral part of the Wonderland Mall." *Id.* The Ward Property is subject to the Reciprocal Parking and Operating Agreement dated May 29, 1957, recorded September 26, 1957, in Wayne County Records ("REA"), which grants an option to purchase the Ward Property to the owner of the Wonderland Mall ("Option"). *Id.*

As of January, 2001, Montgomery Ward Development L.L.C. ("Debtor"), a Delaware limited liability company and debtor in United States Bankruptcy Court for the District of Delaware ("the Bankruptcy Court"), was the owner of the adjoining Ward Property. *Id.* at ¶ 18. On February 19, 2001, Debtor filed a motion with the Bankruptcy Court for authority to, *inter alia,* sell certain real property (including the Ward Property) which it owned in fee. *Id.* at 19. LaSalle argues that notice of Debtor's motion was provided to Wonderland, Wonderland did not forward that notice to LaSalle. *Id.*

On or about February 27, 2001, Wonderland filed a response to the Debtor's motion objecting to the proposed sale of the Ward Property. *Id.* at ¶ 20. In its objection and supporting brief, Wonderland asserted its rights would be substantially prejudiced by a sale of the Ward Property contrary to the terms of the REA. The Complaint alleges that Wonderland asserted in its objection that, under Michigan law, the REA was a covenant running with the land burdening the Ward Property and benefitting the Wonderland Property mortgaged to LaSalle. *Id.* at 21. The Complaint continues:

> Wonderland did not press its objection to its conclusion. Instead, recognizing the Loan was then in default and that Wonderland's rights to the Ward Prop-

erty created by the REA would revert to [LaSalle] upon foreclosure of the Mortgage, Wonderland's principals orchestrated a transaction to create an alter ego to Wonderland called Middlebelt (Owned by Wonderland's principals), and to have Middlebelt acquire the Ward Property from the Debtor.

*Id.* at 22.

LaSalle asserts that, as part of its "scheme," Wonderland agreed not to press its objection if the Debtor and its real estate marketing agent ("Kimsward") stipulated that the REA remained in full force and effect and that except for the transfer to the initial purchaser from Debtor, Wonderland retained the right to enforce the option to purchase the Ward Property under the REA and to enforce the "going dark" provisions of the REA. *Id.* at ¶ 23. According to LaSalle, Wonderland suggested the stipulation so as to "pave the way to steer the Ward Property to Middlebelt by purporting to waive or alienate these two important rights which waiver or alienation required the specific consent of [LaSalle]." *Id.*

On February 28, 2001, the Wonderland and Kimsward entered into a Stipulation, which became part of the Bankruptcy Court's March 1, 2001, "Designation Rights Order." *Id.* at ¶ 24. The Designation Rights Order enabled the sale of the Ward Property. LaSalle argues that the actions by Wonderland and its principals constituted a transfer or alienation of Property under the Loan Agreement and Mortgage and, as such, an independent default under the Mortgage. *Id.* at ¶ 25.

LaSalle claims that, upon learning of the intended sale of the Ward Property, it gave notice of interest to the Debtor by letter dated August 2, 2001, and filed an objection to the sale for which Middlebelt had been formally "designated" as purchaser in Bankruptcy Court on August 13, 2001. *Id.* at ¶ 26. On October 25, 2001, the Bankruptcy Court held a hearing on LaSalle's objections (the "October 25 hearing"). At the hearing's conclusion, the Bankruptcy Court issued its Order by which it allowed Middlebelt to purchase the Ward Property by expressly preserving for decision by a court in another forum LaSalle's entitlement to assert all its rights flowing from its Mortgage against Wonderland and Middlebelt. *Id.* at ¶ 27. LaSalle has attached a copy of the Bankruptcy Court's Order as an attachment to its Complaint.[1] *See* Ex. D.

On September 14, 2001, LaSalle filed Civil Action 01–73507 in this Court against Wonderland, its principals, and third parties (identified therein as "Ogden Defendants") to recover collateral pledged to secure LaSalle's Loan and diverted by Wonderland to its individual principals ("Wonderland II"). *Id.* at ¶ 30. This Court is currently considering the Defendants' Motion to Dismiss and/or for Summary Judgment in Wonderland II. According to LaSalle, "[t]his action, while flowing from the same loan transaction [as that in Wonderland II], involves an additional effort by LaSalle, for the benefit of the Trust, to recover collateral pledged to secure the Loan which Wonderland's Principals have wrongfully converted or otherwise attempted to place collateral beyond the reach of LaSalle." *Id.* at ¶ 31.

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) provides for a motion to dismiss for failure

---

1. LaSalle has also attached the following documents as Exhibits to its Complaint: the REA as Exhibit A; the Mortgage as Exhibit B; Wonderland's Objection and Supporting Brief filed in the Bankruptcy Court as Exhibit C; a copy of the Bankruptcy Court's October 25, 2001 Order as Exhibit D; and an affidavit filed by LaSalle to "protect its rights in the Ward property as to any potential third parties" as Exhibit E.

to state a claim upon which relief can be granted. This type of motion tests the legal sufficiency of the plaintiff's Complaint. *Davey v. Tomlinson,* 627 F.Supp. 1458, 1463 (E.D.Mich.1986). A court takes the factual allegations in the Complaint as true when evaluating the propriety of dismissal under FED. R. CIV. P. 12(b)(6). *Ziegler v. IBP Hog Market, Inc.,* 249 F.3d 509, 512 (6th Cir.2001); *Hoeberling v. Nolan,* 49 F.Supp.2d 575, 577 (E.D.Mich. 1999). Further, the court construes the complaint in the light most favorable to the plaintiff, and determines whether it is beyond a doubt that the plaintiff can prove no set of facts in support of his claims that would entitle him to relief. *Varljen v. Cleveland Gear Co., Inc.,* 250 F.3d 426, 429 (6th Cir.2001).

If matters outside the pleading are presented in a FED. R. CIV. P. 12(b)(6) motion and considered by the court, the motion shall be treated as one for summary judgment under FED. R. CIV. P. 56(b) and disposed of as provided thereunder. *Talley–Bey v. Knebl,* 168 F.3d 884, 885 (6th Cir. 1999); *Vashi v. Charter Township of West Bloomfield,* 159 F.Supp.2d 608, 612 (E.D.Mich.2001). Rule 56(c) states that summary judgment should be entered only where "the pleadings, depositions, answers to the interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The presence of factual disputes will preclude granting of summary judgment only if the disputes are genuine and concern material facts. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute about a material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

Although the Court must view the motion in the light most favorable to the nonmoving party, where "the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Moreover, the court need not accept as true legal conclusions or unwarranted factual inferences. *Hoeberling,* 49 F.Supp.2d at 577.

Summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. 2548. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Id.* A court must look to the substantive law to identify which facts are material. *See Wonderland Shopping Ctr. Venture Ltd. P'Ship v. CDC Mortgage Capital, Inc.,* 274 F.3d 1085, 1092 (6th Cir.2001). Michigan contract law applies to the instant action.

## III. ANALYSIS

Defendants argue that LaSalle's claims should be dismissed under Rule 12(b)(6) for five reasons. *See* Defs.' Br. In Supp. of Mot. to Dismiss and/or for Summ. J. at 12–17 (hereinafter referred to as "Defs.' Br."). Defendants's first contention is that LaSalle's claims are barred by collateral estoppel. *See id.* at 12–14. Because the Court finds that Plaintiff's Complaint is barred by the doctrine of collateral estop-

pel, it declines to address Defendants' other arguments.[2]

According to Defendants, "LaSalle unsuccessfully litigated whether Middlebelt was in good faith in the bankruptcy court—and 'one fair opportunity to litigate is enough.'" *See* Defs.' Br. at 13 (citing *In re Castaneda,* 81 B.R. 470, 472 (N.D.Ill. 1998)). Because LaSalle's claim of common law fraud and LaSalle's allegation of violations of Michigan's fraudulent conveyance statute necessarily require LaSalle to demonstrate "bad faith," Defendants argue that the bankruptcy court's determination that Middlebelt was acting in good faith in purchasing the Ward Property precludes both of LaSalle's claims.

LaSalle responds that the bankruptcy court's explicit pronouncement that its determination that Middlebelt exercised good faith in the purchase of the Ward Property would have no relevance to LaSalle's argument that Wonderland had no right to modify the REA and that LaSalle had the right to purchase the property belies Defendants's collateral estoppel arguments. *See* Pl.'s Resp. Br. at 8. LaSalle continues: "[T]he Bankruptcy Court made no ruling or finding regarding whether Wonderland could legally waive the appurtenant right to exercise the option given by the REA (and mortgaged to LaSalle) in order to allow another Schostak entity to purchase the Ward Anchor Pad." *Id.* at 12.

Defendants Reply argues that the bankruptcy court's determination that Middlebelt acted in good faith in acquiring the Ward Property is "conclusive" and cannot be relitigated in this suit. *See* Defs.' Reply Br. at 4. In Defendants estimation, "Middlebelt's good faith is a complete defense to the fraudulent conveyance claim against it in this litigation." *Id.* "Moreover," Defendants argue, "the existence of Middlebelt's good faith also precludes a fraudulent conveyance claim against Wonderland" because LaSalle argues that the former is the "alter ego" of the latter.[3] *Id.* This Court agrees with each of Defendants' contentions.

■ Generally, collateral estoppel precludes relitigation of an issue in a subsequent, different cause of action between the same parties, or their privies, if the prior proceeding (1) actually litigated and determined the issue and (2) entered a valid, final judgment. *Ditmore v. Michalik,* 244 Mich.App. 569, 577, 625 N.W.2d 462 (2001); *see also Dearborn Heights Sch. Dist. No. 7 v. Wayne County MEA/ NEA,* 233 Mich.App. 120, 125, 592 N.W.2d 408 (1998) ("Collateral estoppel bars relitigation of issues where the parties had a full and fair opportunity to litigate those issues in an earlier action."). For collateral estoppel to apply, the basis of the previous judgment must be "clearly, definitely, and unequivocally ascertained." *Ditmore,* 244 Mich.App. at 578, 625 N.W.2d 462 (citing *People v. Gates,* 434 Mich. 146, 158, 452 N.W.2d 627 (1990)).

Here, the bankruptcy court expressly found that "Middlebelt is a good faith purchaser entitled to the protections of 11 U.S.C. § 363(m)." *See* Order Denying the

---

**2.** Defendants also argue that: (1) there was no breach of the Loan Agreement because the Loan Agreement did not require or permit the exercise of the Option; (2) the tort claims are barred by the "economic loss doctrine"; (3) the fraud claims must be dismissed because they are is based future promises; and (4) Defendants have made no false representation to LaSalle to support a fraud claim.

**3.** Defendants further argue that collateral estoppel applies to LaSalle's claims against Wonderland because Wonderland is in privity with Middlebelt. *See* Defs.' Br. at 14. Plaintiff does not rebut this argument. This Court concludes, therefore, that privity exists between the Defendants such that dismissal as to Middlebelt requires dismissal as to Wonderland as well.

Objection of LaSalle Bank, N.A. to Proposed Sale of Real Estate in Livonia, Michigan to Middlebelt Plymouth Venture, L.L.C., *In re Montgomery Ward, L.L.C., et al.*, Bankruptcy No. 00–4667 (D.Del. Oct. 25, 2001). A review of the transcript of the October 25 hearing reveals that, while the bankruptcy court intended for the sale of the Ward Property to be "subject to the terms of the Agreement dated May 29, 1957 and LaSalle/CDC and Middlebelt preserve any and all rights they have as to whether the Agreement was modified by the Stipulation among Wonderland Mall, the Debtor and KRC Acquisition Corp. dated Feb. 28, 2001," *id.*, the bankruptcy court also intended that the issue of Middlebelt's good faith was to be conclusively determined.[4]

■ The issue of good faith was "actually litigated and determined," and the bankruptcy court irrefutably entered a valid, final judgment, from with LaSalle did not appeal. Further, the basis of the bankruptcy court's judgment was "clearly, definitely, and unequivocally ascertained," as evidenced by the transcript of the October 25, 2001 hearing held on the appropriateness of Middlebelt's acquisition of the Ward Property. Any subsequent action raising the issue of good faith, therefore, will be precluded by the bankruptcy court's decision.

Michigan's fraudulent conveyance statute is codified at M.C.L. § § 566.34, which states that "[a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor ... if the debtor made the transfer or incurred the obligation ... [w]ith actual intent to hinder, delay, or defraud any creditor of the debtor." To demonstrate the "actual intent to hinder, delay,

or defraud any creditor of the debtor" prong of § 566.34, it is not necessary that such an intent was the sole motivation for the transfer; the creditor must only demonstrate that a transfer "is motivated wholly or in part by desire to hinder, delay, or defraud creditors." *Kelley v. Thomas Solvent Co.*, 725 F.Supp. 1446, 1455 (W.D.Mich.1988); *see also In re Spearing Tool & Mnf. Co., Inc.*, 171 B.R. 578, 582 (Bankr.E.D.Mich.1994) ("[T]he intent requirement is satisfied when the transfer is motivated wholly or in part by a desire to hinder, delay or defraud creditors."). The question of a debtor's intent is ultimately one of fact. *Marine Nat'l Bank v. Swigart*, 262 F. 854 (6th Cir.1920).

As Defendants correctly observe, good faith, in the bankruptcy context, "does *not* encompass the fraudulent intent alleged by LaSalle: 'Good faith' purchaser status is *precluded by ... fraud*, collusion with the trustee, and taking 'grossly unfair advantage' of other bidders." *See* Defs. Br. at 12 (emphasis in original) (citing *In re Mark Bell Furniture Warehouse, Inc.*, 992 F.2d 7, 8 (1st Cir.1993)); *see also In re Abbotts Dairies*, 788 F.2d 143, 147 (3d Cir.1986); *In re Vetter Corp.*, 724 F.2d 52, 56 (7th Cir.1983); *Richards v. Swinebroad & Denton Auctioneers*, 1985 WL 13526, *2 n. 2, 1985 U.S.App. LEXIS 14281, *6 n. 2 (6th Cir. July 3, 1985) (following *In re Vetter*). The bankruptcy court's finding of good faith on the part of Middlebelt forecloses a finding of fraudulent intent.

LaSalle's numerous citations to the transcript of the October 25 proceeding wherein the bankruptcy judge states on numerous occasions that his determination would have no affect on LaSalle's state law claim

---

4. Citing *Atlantic Richfield Co. v. Monarch Leasing Co.*, 84 F.3d 204, 209 (6th Cir.1996), Defendants argue that "[t]he bankruptcy court speaks through its orders and not through its statements at a hearing." *See*

Defs.' Reply Br. at 2. The Court recognizes this generalized principle of law, but notes that *Atlantic* does not foreclose an examination of the transcript to ascertain the meaning of the bankruptcy court's orders.

that Wonderland had no right to modify the REA and that LaSalle had the right to purchase the property does not alter this conclusion. The bankruptcy judge's statements merely preserve those claims at state law which could survive notwithstanding the bankruptcy court's rulings, *e.g.*, a breach of contract against Wonderland. Where, as here, the state law claim that LaSalle attempts to bring has fraudulent intent as an essential element for which it bears the ultimate burden of proof, the state law claim is foreclosed by the doctrine of collateral estoppel.

LaSalle is unable to establish a core element of its fraudulent conveyance claim, to wit: fraudulent intent. Dismissal is appropriate under such circumstances; there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *See Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. 2548. As each Count listed in LaSalle's Complaint is inextricably connected to its allegations of fraud on the part of Middlebelt, the Complaint must be dismissed in its entirety.

## IV. CONCLUSION

This Court concludes that LaSalle's suit is precluded by the doctrine of collateral estoppel.

Accordingly,

**IT IS HEREBY ORDERED THAT** Defendants' Motion to Dismiss and/or for Summary Judgment (**Docket # 3, filed January 30, 2002**) is **GRANTED**.